## Kirkpatrick's Exor. v. E. Rehkoph Saddlery Co., et al.

## B. A. James Manu. Co. E. Rehkoph Saddlery Co.

(Decided June 9, 1911.)

### Appeal from McCracken Circuit Court.

1. Fraud—Recovery of Goods—When one who is insolvent obtains goods from another, with the intention of not paying therefor, the seller may reclaim his goods as having been obtained from him by fraud.

2. Same—Bona Fide Purchaser—One who has bought goods from another, who had theretofore obtained them through fraud, can defend his title thereto only upon the ground that he was a bona fide purchaser of the goods for value, and without notice of the fraud practiced by his vendor in obtaining them. All

three elements must exist in behalf of the last purchaser; if any one be missing, his rights are inferior to the rights of the original seller.

3. Appeal—Finding of Fact by Chancellor—It is a rule of this court not to disturb the judgment of the chancellor on the facts, where the evidence is conflicting, and the mind is left in doubt as to the truth.

4. Conversion—Liability For—Where a bank loaned money and took warehouse receipts for goods in storage as security for the loan, and in selling the pledged goods it also sold goods which were not embraced in the warehouse receipts, the bank is liable for conversion for selling the goods which were not embraced in the warehouse receipt.

HENDRICK, MILLER & MARBLE and TOM B. McGREGOR for appellants.

BRADSHAW & BRADSHAW and J. C. FLOURNOY for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

These cases grew out of the failure and assignment of the E. Rehkoph Saddlery Co., of Paducah, on September 20, 1906. The American-German National Bank v. Gray & Dudley Hardware Co., 129 Ky., 105, is a companion case, and the opinion in that case states most of the essential facts which led up to and culminated in the assignment. Kirkpatrick was a leather merchant of Philadelphia, and the E. Rehkoph Saddlery Co., hereinafter called the Saddlery Company for brevity, manufactured harness and leather goods at Paducah. In response to an order by the Saddlery Company, Kirkpatrick sold and shipped it on July 11, 1906, 100 rolls of harness leather for the agreed price of $5,437.49; and, on August 9th of the same year he sold it a second consignment of 110 rolls of harness leather for the agreed price of $5,580.60, making a total purchase price of $11,018.09 for the two consignments. The first shipment reached Paducah on July 20th. Oscar C. Harper was a clerk in the office of the Saddlery Company, and had no estate. On July 20, 1906, the day the first shipment was received by the Saddlery Company, it deposited the leather comprising said shipment in O'Brien's Second Street warehouse, and took O'Brien's Warehouse Receipt No. 10 therefor. On the same day Harper executed his accommodation note to the Saddlery Company for $5,000.00, and the Saddlery Company attached the O'Brien Warehouse Receipt No. 10 thereto, and discounted the note at

the American-German National Bank, the appellee, which is hereinafter called the Bank for brevity. Kirkpatrick made his second shipment of 110 rolls to the Saddlery Company on August 9th, and it was received by the latter on September 4th, and carried directly to the Cohankus Manufacturing Company's building. On September 1, 1906, O'Brien issued his Warehouse Receipt No. 20 to the Saddlery Company for 100 rolls of harness leather stored in the building of the Cohankus Manufacturing Company, which O'Brien used as a warehouse. On September 4th Harper gave his second accommodation note to the Saddlery Company for $6,000.00, which it likewise endorsed to the Bank, and attached thereto as security Warehouse Receipt No. 20 of September 1st, for 100 rolls of Kirkpatrick's second shipment of 110 rolls of leather, and also O'Brien's Warehouse Receipt No. 21 for whips and lashes which had been sold to the Saddlery Company by the Gray & Dudley Hardware Co. (129 Ky., 105.)

In argument counsel have treated the two O'Brien warehouse receipts of July 20 (No. 10) and of September 1st, 1906 (No. 20), as carrying to the Bank the entire 210 rolls of leather sold by Kirkpatrick to the Saddlery Company, but the record shows that the last named receipt calls for only 100 rolls of leather (not for 110 rolls), stored in the Cohankus Manufacturing Company's building. The note for $6,000.00 shows on its face that it is secured by fifteen rolls of leather valued at $938.69 in addition to the 100 rolls called for by warehouse receipt No. 20; but it does not identify the fifteen rolls, and there is nothing to show that a warehouse receipt was ever issued for the last ten rolls contained in Kirkpatrick's last shipment. About the middle of September the bank became anxious about its debt, and required the Saddlery Company to either pay it, or to more effectually secure it; and being unable to do so, it authorized the Bank to sell the collateral represented by the warehouse receipts. The Bank acted upon this authority, and on September 17th sold the leather covered by the two warehouse receipts above mentioned, together with other pledged merchandise, to the Starks-Ullman Saddlery Co., for $23,000.00; and it took possession of the property and used it in its business. On September 20th—three days later,—the Saddlery Company made an assignment to R. J. Barber for the benefit of its creditors. At the time of the assignment it owed over $150,000.00, and had assets worth

about $25,000.00. On September 25th Kirkpatrick's executor brought this suit in equity to recover its goods from the Saddlery Company upon the ground that the leather had been obtained by fraud and while said purchaser was insolvent, and without the intention of paying therefor, and in pursuance of a scheme to pay the pre-existing debt of the Bank. By an amended petition the Bank, Harper, the Cohankus Manufacturing Company, O'Brien, the Starks-Ullman Saddlery Company, O. B. Starks, and Barber the assignee, were made parties defendant, and a judgment was asked against them for $11,018.09, in case the property should not be recovered. A specific attachment was issued and levied upon the leather, which was retained by the defendant upon giving the forthcoming bond required by law.

The appellant, B. A. James Manufacturing Company, of Clarksville, Tenn., sold and shipped to the Saddlery Company in August, 1906, 100 dozen collar pads, for the agreed price of $258.20; and on September 15, 1906, it sold and shipped to said Saddlery Company a second shipment of 104 dozen collar pads, for the agreed price of $269.64. The second shipment, which went by river, could not, under ordinary conditions, have reached Paducah before September 17th—the day on which the Bank made the lumping sale to the Starks-Ullman Saddlery Co. Immediately after the assignment of the Saddlery Company on September 20th, James went to Paducah in search of his goods. He found that his first shipment of 100 dozen collar pads had theretofore been shipped to Memphis, and were beyond recovery; but, after quite a search he found his last shipment of 104 dozen collar pads stored in a house belonging to Scott, who did not know that the goods were there. The testimony is somewhat confusing upon this point, but we conclude that the goods were stored in the Scott house by O'Brien. The B. A. James Manufacturing Company brought this suit on September 27th to recover its goods, upon the ground that they had been obtained by fraud, and for the same purpose heretofore indicated with respect to Kirkpatrick's goods. A specific attachment therefor was levied upon the second shipment of 104 dozen collar pads, which were released upon the execution of the usual forthcoming bond. The answers traversed the allegations of the petitions. Upon the trials the chancellor dismissed the petition, and from those judgments Kirkpat-

rick and the B. A. James Manufacturing Company prosecute these appeals.

There can be no doubt, under the evidence, that in each of these cases the Saddlery Company obtained these goods by fraud, and that as between the appellants and the Saddlery Company the appellants could have recovered them under the authority of Dietz's Assignee v. Sutcliffe, 80 Ky., 650, and kindred subsequent cases. And, as was pointed out by this court in the opinion in the case of the American-German National Bank v. Gray & Dudley Hardware Co., the bank having received the goods, could defend only upon the ground that it was a bona fide purchaser for value, and without notice of the fraud practiced by the Saddlery Company in obtaining the goods. All three of these elements must exist in behalf of the Bank in order to sustain its purchase; if any one be missing, the appellants' rights are superior to the rights of the Bank under its purchase, and they may reclaim their goods.

Some additional facts have been brought out upon these trials, which it is claimed make these cases stronger than the case of the Gray & Dudley Hardware Co., wherein it prevailed against the Bank. One instance of this new evidence appears here in the fact that in May, 1905, the Saddlery Company began to draw bogus drafts, which it discounted to the Bank, and which the Bank would, in turn, forward for collection. Of course, the drafts would be returned uncollected, and they would, in many cases, be taken up with other bogus drafts which would, in turn, be discounted and put in course of collection. In this way the Saddlery Company obtained a fictitious credit for the amount of these bogus drafts in circulation; and, as these bogus drafts aggregated about $30,000.00, it is insisted that their size, and the repeated return thereof uncollected, was sufficient to put the Bank on notice that the Saddlery Company was not only insolvent, but was "kiting" paper for fraudulent purposes. It is further insisted that Thompson, the President of the Bank, was, as a stockholder and officer of the Saddlery Company, in a position to know of these bogus drafts. The evidence, however, clearly shows that the officers of the Bank first learned of these bogus drafts about the middle of September, 1906, and that it thereafter refused to permit the Saddlery Company to continue the practice. The alleged suggestion by the President of the Bank to O'Brien that he obtain warehouse

room for the purpose of storing the Saddlery Company's leather in order that it might be pledged to the Bank, was, if true, not inconsistent with good faith on the Bank's part. It was merely a business plan by which the leather could safely be pledged for loans, and is not an unusual practice among good business men. The chancellor held that the Bank had sustained its purchase by showing that it was a bona fide purchaser of the goods for value, and without notice of the Saddlery Company's fraud; and under the proof, and the rule which requires us to give due weight to the chancellor's finding of facts under conflicting evidence, we do not feel justified in disturbing it. In Moore v. Moore, 30 Ky. L. R., 383, this court said it always accords great weight to the conclusions of the chancellor upon the facts. "It is our rule not to disturb the judgment of the chancellor on the facts where the evidence is conflicting and the mind is left in doubt as to the truth." Spicer v. Holbrook, 29 Ky. L. R., 866; Combs v. Combs, 29 Ib., 919.

In one respect, however, the judgment in Kirkpatrick's case is erroneous, when considered under the rule heretofore announced. As above pointed out, 10 rolls of Kirkpatrick's last shipment of leather, marked No. 174, No. 1, and sold for $547.39, were not included in any of the warehouse receipts pledged by the Saddlery Company to the Bank; and since the answer admits and the proof shows that the Bank sold that leather, it follows that it sold it without authority, and without title, and should account therefor to Kirkpatrick as of September 17, 1906, the date of the conversion.

In the case of B. A. James Manufacturing Company, the answer admits that the collar pads of that company were sold by the Bank to the Starks-Ullman Company under the general authority of sale given it on September 17th by the Saddlery Company. There is no evidence, however, that O'Brien ever issued a warehouse receipt for these goods to any one; neither does it appear how the Bank obtained possession of them. The record merely shows that after quite a search for his goods James found them in the Scott house, as the result of information conveyed to him by a telephone message from some person who declined to disclose his identity. Scott did not know the goods were in his house, or who put them there. The authority given the Bank by the Saddlery Company to sell, covered only the goods which

it had pledged to the Bank by means of the Warehouse Receipts. And, as they did not embrace these goods, it is clear that the Bank acquired no interest in, or right thereto; and, that in selling them to the Starks-Ullman Company, the Bank was guilty of a conversion thereof, and should account for the goods, or their value, as of September 17, 1906, the date of the conversion.

The judgment in each case is reversed with instructions to set it aside, and to enter judgments in conformity with this opinion.