## Leigh Banana Case Company v. Rudy, et al.

(Decided April 17, 1912.)

### Appeal from McCracken Circuit Court.

1. **Landlord and Tenant.**—A landlord is not bound to keep his property in repair during the term covered by the lease, unless he agrees to do so; but, if he agrees to keep it in repair, and fails

to do so, the tenant may abandon it and terminate the contract whenever the property becomes unfit for the purpose for which it was intended.

2. Landlord and Tenant—Covenant for Quiet Possession.—A covenant to keep a tenant in quiet possession of the premises during the term is not broken by an occasional seepage of water through the floor of the room immediately over the leased premises, but not to such an extent as to render the leased premises unfit for the use for which they were rented.

3. Appeal—Finding of Chancellor.—A finding of fact by the chancellor will not be reversed upon appeal where the evidence is conflicting, and leaves the mind in doubt.

D. G. PARKS for appellant.

WHEELER & HUGHES for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

By a lease dated March 1, 1909, the appellant rented from the appellees, for a term of three years, at a rental of $25 per month, a room under the kitchen and servants' bed-room of the New Richmond House in Paducah, and a shed for storage purposes; the lessors covenanting to keep the tenant in quiet possession of said premises during the term. The appellant is a corporation engaged in the manufacture of cases used in the shipment of bananas. It had begun in a small way a short time before, and its business had been gradually growing. It paid the rent under its lease to December 1, 1909, when it vacated the leased premises and removed into a larger and more convenient place of business.

On April 2, 1910, appellant brought an action in equity to cancel the lease for a breach of the covenant of quiet enjoyment, and a failure of consideration by reason of injuries to the premises, and a constructive eviction from them. Subsequently, on September 15, 1910, appellees brought a common law action for $225 rent due under the lease. This last action was transferred to the equity side of the docket, and the two actions were there consolidated. Upon a final hearing the chancellor dismissed appellant's action to cancel the lease, and gave appellees a judgment for $225 rent; and from that judgment the tenant prosecutes this appeal.

The record presents a question of fact only—the appellant's right to vacate the premises. There is little difficulty as to the law of the case. If the covenant for quiet possession was not broken, the lease can not be

canceled; and appellant was not justified in vacating the premises, and is liable for the rent.

The right to vacate is predicated upon the idea that the principal room used for manufacturing purposes was located under the kitchen and servants' room of the upper premises of the New Richmond Hotel, occupied by Phillips Bros., as a hotel, and that the room so occupied by appellant was made untenantable by reason of water seeping through the floor of the kitchen on to the principal room of the appellant to such an extent, and in such a way as to render the room unfit for use.

A large amount of testimony has been taken upon that subject, but the scope of it is rather narrow. This room had been used for the same purpose by the appellant, or their predecessors in business, for sometime before the execution of the lease of March 1, 1909. The same trouble that existed after the execution of the new lease had existed before that time, and in a more pronounced form. Appellant had complained to appellees of the seeping water, and appellees had not only given instructions to appellant's managing officers to have done whatever they thought was necessary to remedy the trouble, but appellees had gone to quite a good deal of expense and trouble in their efforts to stop the leak. The trouble was not a continuous one, but would appear perhaps two or three times each week, whenever the hotel proprietors would scrub the floor of the kitchen. For the purpose of keeping water from falling upon the machinery and merchandise in appellant's manufacturing room, appellee constructed a large metal pan which was hung up against the ceiling, so as to cover about one-half of it, and thus catch the water that would probably seep through the overhead floor and ceiling. When the water was thus caught, it was carried off by proper gutters and downspouts. Nevertheless, after this was done, there is some evidence that the water would sometimes seep down the sides of the walls, and be more or less objectionable.

The importance to be given to this trouble is, however, to be measured somewhat by the fact that the complaints by appellant were made principally, if not entirely, before the execution of the lease of March 1, 1909. The lease of March 1, 1909, was made after appellees had agreed to build an additional shed for storage purposes, and with full knowledge on appellant's part of all the conditions that existed at the time. On June 21,

1909, appellant wrote to appellees saying the shed that had been built was not large enough for their increased business, and asked appellees to construct an additional room, and to change the lease to correspond. Appellees testify that there were no complaints made by appellant after the execution of the lease, until sometime in October, 1909, when Charles Leigh, the president of appellant company, informed appellee J. A. Rudy that appellant would have to give up the premises. The conversation that took place is thus given by J. A. Rudy, and is not controverted in its essential features, by the appellant:

"50. Tell the court, if after the signing of this lease up until October, 1909, Mr. O. P. Leigh or Chas. Q. C. Leigh or any one else for the Leigh Banana Case Company, or at all, made any complaint to you of the condition of the leased premises?

"A. I have no recollection to have been complained to about them until sometime in October, Mr. Chas. Q. C. Leigh came to see me at the store.

"51. What took place when Mr. Chas. Q. C. Leigh came to see you at the store?

"A. I was on the second floor over the shoe room and was starting down stairs and saw Mr. Leigh coming up and stopped and he said to me 'Jim, I am afraid we are going to have to give up your premises down there.' I says, 'For why,' he says, 'Well, my men continue to complain of the water coming down.' I said to him 'Well, Charley, I am mighty sorry to hear that and I will fix it if I have to put an entire galvanized iron ceiling under the entire floor to obviate the trouble.' He said, 'Well, don't do that, we want to get where we have got more room.' I says, 'Charley, isn't that the meat in the cocoanut?' He says, 'Partly so, and I thought if I could pay you what was right to vacate the premises it would suit me.' I said to him 'I have been to a big expense fixing up that property, you haven't retained it long enough to pay me back one-third of the money I have expended on it. I have got a $900 contract with you and I am going to make you pay it if I can,' and we parted.

"52. Did he say anything more?

"A. Never."

Without going further into the details of the proof, for the reason that we deem it unnecessary, it is sufficient to say that the substance of it is, that the princi-

pal complaints were made before the lease of March 1, 1909, was executed; that appellees did everything that was asked of them in the way of preventing the seeping of the water, and practically succeeded in remedying the trouble; and that appellant made no serious complaint after the execution of the new lease until it became apparent that they would have to have larger and more commodious quarters. The interference of the seeping water was only occasional, and not very serious at any time after the repairs were made.

An effort has been made to bring this case within the well established doctrine laid down in Logan v. Langan, 145 Ky., 599, where this court held that a landlord is not bound to keep property in repair during the term covered by the lease, unless he agrees to do so; but that if he does agree to keep it in repair, and fails to do so, the tenant may abandon it and terminate the contract whenever the property becomes unfit for the purpose for which it was intended. The trouble here, however, is, that the facts of this case do not bring it within the doctrine there laid down, since there was, in this case, no covenant to repair. Upon the controlling issue of fact as to whether there was a seepage of water sufficient to amount to a breach of the covenant for quiet possession, and thereby operate as an eviction, the testimony was conflicting.

The chancellor found, as a matter of fact, that the seepage did not render the house untenantable for the purpose for which it was rented, and did not, therefore, amount to a technical eviction. Under this state of the record we are not inclined to disturb this finding of fact by the chancellor. Colyer Bros. v. Neyens, 143 Ky., 798; Kirkpatrick's Exor. v. Rehkoph Saddlery Co., 144 Ky., 134.

Judgment affirmed.