## McGoodwin, et al. v. Shelby, et al.

(Decided June 21, 1918.)

## Appeal from Marion Circuit Court.

1. Guardian and Ward—Settlement and Release of Claims.—A guardian, unless restrained by statutory regulation, may compromise, settle and release claims to and made by and on behalf of his ward and the ward will be bound thereby unless it is done in bad faith or in fraud of his rights.

2. Guardian and Ward—Compromise of Ward's Claims.—Where there are three alleged sets of heirs to an estate, each claiming to the exclusion of the other, and the claims are uncertain and doubtful, the guardian of infant claimants may, under the circumstances, enter into a compromise of the claim of his ward to the estate whereby he certainly fixes the right of his ward to a given part of the estate without extended litigation, and the ward will be bound thereby, unless it be shown that the compromise was not made in good faith or was obviously against the interest of the wards.

H. W. RIVES and CHARLES H. RODES for appellants.

H. P. COOPER and H. S. McELROY for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

In May, 1915, Miss Florrie Hood, a most eccentric and peculiar woman, died intestate, childless and unmarried, at her home in Lebanon, Kentucky, she being about seventy years of age, and the owner by inheritance of several houses and lots and some acreage property in the city of Lebanon, and quite an amount of personal property, the whole aggregating in value between thirty and forty thousand dollars. There were no close relatives living so far as known. Some very distant relatives by the name of Harrison and one Mrs. Buena McGoodwin, also a distant relative, began to assert claim to the estate left by Florrie Hood, and to insist that they, the Harrisons and Mrs. McGoodwin, were the sole and only heirs of the deceased maiden lady. It was known, however, that one Thomas C. Shelby, a nephew of Miss Florrie Hood, had many years before left Marion county on account of trouble and had gone to Florida or some southern state, and had not been heard from since his departure, so far as the public was advised. Whether Thomas C. Shelby was living or dead, or if dead, had he left heirs, became a very important question in the settlement of the Hood

estate, because if he was living or had left heirs of his body, capable of inheriting from collateral kin, he or they were entitled to the entire estate of Miss Hood after the payment of outstanding claims. Miss Hood had lived the life of a recluse for many years before her death, except that one William M. Yowell, not in any manner related to her, had resided in the same house with her in Lebanon and had acted as foreman or manager of her estate. Shortly after the death of Miss Hood, Yowell asserted a claim against the estate for about twenty-four thousand dollars, as he declared, for services rendered by him to Miss Hood, as manager and overseer, and the petition in the action which he instituted to recover this amount, averred that Miss Hood had promised and agreed in consideration of his services to deed or will her entire property to Yowell, but had died without carrying out the agreement. This suit was in equity and contained a prayer for the settlement of the estate of Florrie Hood. About ten days after the institution of this action Mrs. McGoodwin and the Harrison heirs, joining with them the administrators of the estate of Miss Hood, instituted an action for a settlement of the estate and set forth facts showing themselves to be the sole and only heirs of Miss Hood and alleged that Thomas C. Shelby was dead, leaving no heirs. Meanwhile the administrators of the estate and their attorneys were prosecuting a diligent search through Florida, Mississippi and other southern states to find Thomas C. Shelby, the lost heir. The court appointed a non-resident attorney to correspond with and notify the unknown heirs, including Thomas C. Shelby, of the nature and pendency of the actions. This non-resident attorney sent out about fifteen hundred post cards to different post offices in Florida, Mississippi and other southern states in an attempt to locate Shelby and through this method found Mrs. Lief, the widow of Thomas C. Shelby, at Chipley, in Vernon county, Florida. Thereupon the attorneys for the administrators and the McGoodwin and Harrisons visited Chipley, Florida, for the purpose of making further investigation in respect to Thomas C. Shelby and his three alleged children which the non-resident attorney had reported to have discovered. It was found that the widow of Thomas C. Shelby had married a mix-blooded man by the name of Lief, after the death of Shelby. It was also learned that Mrs. Lief had first married a man by the name of Stone who deserted her, as she claims, and after Stone had left

her she met Thomas C. Shelby and they lived and cohabited together as man and wife for a number of years without being married, and that two of the three children, now appellees in this action, were born before the marriage of Shelby and the widow, and the third was born after said marriage. It also developed that the mother of these three children was the daughter of William Scott, and William Scott was the son of Joe Scott, and Joe Scott was a mulatto, so that the mother of the children of Thomas C. Shelby was not a pure-blooded white woman. The three children of Thomas C. Shelby were all infants and were living with their mother. Upon discovering the heirs of Shelby at Chipley, Florida, the attorneys for the administrators caused a guardian to be appointed for them by the county court of Vernon county, Florida, and this guardian, named W. C. Lockey, a resident of Chipley, retained the Kentucky attorneys who were there representing the administrators, to represent the infants and the guardian in the litigation in Kentucky. This employment of the attorneys, it is now said, was conditioned upon the Shelby children being able to establish their right to the estate. It is also asserted and set forth in pleadings of the Harrisons and Mrs. McGoodwin that they, the Harrisons and Mrs. McGoodwin, would withdraw their claim as heirs to the estate of Miss Hood if Thomas C. Shelby or children of his entitled to inherit the estate, should finally be discovered and assert claim to the estate. Upon the attorneys returning to Kentucky the Harrisons and Mrs. McGoodwin practically conceded the right of the Shelby children to inherit the estate. At that time Yowell was prosecuting his claim for twenty-four thousand dollars against the estate, and this was being resisted by the Harrisons, Mrs. McGoodwin, and the administrators. The guardian also joined in the defense in that action. The Yowell branch of the case was finally brought to trial and Yowell was adjudged entitled to recover twenty-five hundred dollars and his cost. That case, styled William M. Yowell v. S. B. Bottom, et al., was appealed to this court and the opinion may be found in 175 Ky. 635.

After much investigation as to the legitimacy and racial attributes of the three Shelby children, the Harrison heirs and Mrs. McGoodwin decided to contest the right of the Shelby children to inherit the estate of Miss Hood for two reasons: (1) they were begotten and born

out of lawful wedlock and their father and mother were not afterwards married; (2) if begotten and born in wedlock they were mulattoes and therefore incapable of inheriting from collateral kin of their putative father. The administrators as well as the Kentucky heirs were making preparation and obtaining information on which to contest the claim of the Shelby children. Several trips were made by Kentucky attorneys and others to Florida for the purpose of investigating these several charges, and to obtain the facts. Upon one of these trips Mr. John Harrison, one of the alleged heirs, was in Florida and he approached Mr. Lockey, guardian of the Shelby children, and suggested that a compromise of the several claims might be effected whereby the Harrisons, Mrs. McGoodwin and the Shelby children should pool their interests in an effort to defeat Yowell's claim, and for the additional purpose of avoiding expensive litigation' as well as of saving the Shelby children from the damaging imputations and public charge of illegitimacy and racial defects. The guardian and Mrs. Lief discussed the matter at Chipley, and finally agreed that they would submit the proposition of allowing to each of the three sets of alleged heirs, McGoodwin, Harrisons and Shelby, a one-third of the net proceeds of the estate of Miss Hood, to their associates. Mr. Harrison returned to Kentucky and consulted his associates and joint claimants. The widow, Mrs. Lief, and her father, William Scott, and other persons in Florida interested in the Shelby children, carefully considered the proposition. Finally it was agreed by all concerned that the compromise arrangement should be entered into, and accordingly, in November, 1915, the compromise agreement was reduced to writing and signed by all of the parties and their attorneys. The consideration recited in the agreement is as follows:

"Now, therefore, in order to avoid the delay, uncertainty, and expense of litigation; and to adjust and settle the said difference and dispute in a manner deemed reasonable and just to both parties; it is hereby covenanted and agreed as follows:

"As inducement to this contract the following is included:

"Whereas, the said Florrie Hood, in Marion county, Kentucky, has lately died intestate, childless and unmarried, and without other collateral kindred nearer than the second parties, save the infant first parties who are the children of Thomas C. Shelby, deceased, who was a

son of an aunt of Florrie Hood; and that, after investigation of law and facts, a difference and dispute has arisen. between the first and second parties as to whether the first parties are entitled, as children of said Thomas C. Shelby to inherit the estate of Florrie Hood as their father would inherit if he were now living; and that a settlement of said difference and dispute by judicial decree would entail on both parties the expense and worry of protracted litigation, the result of which can not be foreseen."

By paragraph one of said agreement, it is provided:

"The second parties will, in the suit for the settlement of the estate of Florrie Hood now pending in the circuit court of Marion county, Kentucky, promptly file an amended pleading disclaiming any resistance to or contest of the claim of first parties to inherit the said estate as the legal heirs of said Florrie Hood."

By the fourth paragraph of the agreement, it is provided as follows:

"Before any part of the estate of Florrie Hood, to be received by the said guardian, shall be removed from Marion county, Kentucky, the said guardian will pay two-thirds thereof to the second parties, this amount and payment being the consideration for the second parties now abandoning their contemplated contest of the claim of the first parties to be the legal heirs."

After this compromise agreement was entered into the Harrisons and McGoodwin heirs withdrew their claim to the estate, as per their agreement, and a judgment was entered, finding and declaring the three children of Thomas C. Shelby the sole and only heirs of Florrie Hood, deceased, and entitled to the entire net estate. Mr. Lockey, the guardian from Florida, was in attendance upon the Marion circuit court in Kentucky when Mr. Yowell, by a pleading, brought to the attention of the court the fact that an agreement or compromise had been entered into between the three claimants to the estate, whereby the Shelby heirs who had been adjudged by the court the sole and only heirs of Florrie Hood, were to receive only one-third of the net estate out of which they were to pay ten per cent., as fees, to the attorneys. Upon this being brought to the attention of the court the chancellor on his own motion caused an investigation to be instituted for the purpose of learning the true inwardness of the compromise agreement;

whether it had been entered into in good faith and for sufficient consideration and for good reason. The court appointed two reputable lawyers, as guardians *ad litem,* and advisers of the court, to prosecute the investigation. By agreement of parties evidence of the guardian, who was then present, was taken in open court; the evidence of the attorneys who conducted the investigation as well as others connected with the compromise was also taken in open court. The court reporter was called and took the evidence in shorthand, and this has been transcribed and is now a part of the record before us. Not being able to complete the taking of all the evidence the parties desired, the court fixed a time in which the parties should conclude the taking of proof and called a special term of court to convene immediately after the expiration of the time fixed for taking proof, for trial of the cause. After it had been prepared in accordance with the direction of the court, the case was heard at a special term called for that purpose and the following judgment entered, to-wit:

"The above consolidated causes coming on to be heard on all matters not hereto adjudicated and being now submitted to the court upon the pleadings, exhibits proof and argument of counsel, the court advised is of opinion and now adjudges: 1st, that the so-called compromise agreement made and entered into by and between W. C. Lockey, guardian, for the infant defendants herein, to-wit: Wm. Hood Shelby, Sudie Shelby, and Ann Shelby, upon the one part, and the defendants, Mrs. Buena McGoodwin, John S. Harrison and other defendants named therein, on the other part, was unauthorized, was without consideration and is null and void; 2nd, the court having had a personal view of the infant defendants, Wm. Hood Shelby, Sudie Shelby and Ann Shelby, and having carefully considered all the proof addressed on the subject is of opinion and now adjudges that there is no negro or mulatto blood in the said infant defendants and hence, therefore, again adjudges that the said infant defendants, Wm. Hood Shelby, Sudie Shelby and Ann Shelby are the sole and only heirs at law of the decedent, Florrie Hood, and are alone entitled to receive the net proceeds of her estate; 3rd, as to the motion of Wm. M. Yowell, for an allowance of $3,000.00 for the benefit of his attorneys, S. A. Russell, P. K. McElroy, and Lafe S. Pence, upon proof heard in open court the advised is of opinion and adjudges that the sum of three hundred dollars

($300.00) is reasonable compensation for the said attorneys for all the services rendered by them, to the parties; 4th, as to the motion of the administrators for an allowance to them for the benefit of their attorneys upon proof heard in open court, the court is of opinion and now adjudges that the sum of fifteen hundred ($1,500.00) dollars is reasonable compensation for the attorney or attorneys for the said administrators for all services rendered. To the motion of H. P. Cooper for an allowance to him for services rendered as non-resident attorney for the non-residents herein, it is now adjudged that he be allowed the sum of $100.00 in full for all such services. It is further adjudged that said Cooper be and he is allowed the sum of $146.90 on his claim filed herein on October 2, 1917, for expenditures in Florida, and H. S. McElroy is allowed $131.98 on his claim for expenses to Florida and depositions herein, H. S. McElroy and H. P. Cooper as special guardians *ad litem* acting under appointment of court are allowed each the sum of $350.00 for all services rendered as such guardians *ad litem* to this date; S. B. Bottom and Hubert McGoodwin administrators will at once pay over to C. C. Boldrick, master commissioner, of this court, all money now in their hands belonging to the estate of Miss Florrie Hood, deceased, and out of the funds in his hands the said commissioner will first pay all the unpaid cost of these consolidated actions, including the allowances herein made; he will then expend for the support and maintenance of the infant defendants, Sudie Shelby and Ann Shelby, such sum annually as may be necessary for that purpose, not exceeding however the sum of $200.00 each, annually for said purpose; the said commissioner is further ordered and directed to reinvest fifteen thousand dollars ($15,000.00) of the funds remaining in his hands in U. S. government bonds commonly called Liberty bonds, the same to be purchased at not exceeding par and when so invested he will hold same subject to the future orders of the court, the exceptions filed June 30, 1917, to the administrators' final report are overruled. In determining the questions involved in this action and herein adjudged the court considered all the proceedings had at the special term of the Marion circuit court beginning on the 29th day of May, 1917, including the testimony orally heard and taken down by the official stenographer and all of said testimony is made part of the record

herein and the said official stenographer will make one original and one carbon copy of said testimony and file herein for the purpose of appeal should any of the parties hereto appeal from this judgment; Buena Mc-Goodwin, John D. Harrison, et al., object and except to so much. of the judgment as declares the compromise agreement unauthorized and void and so much as declares the infant Wm. Hood Shelby, et al., the sole heirs of Florrie Hood and entitled to her estate; to so much of the judgment as allowed to Wm. M. Yowell for the benefit of his attorneys $300.00 to be paid out of the estate; to so much of the judgment as fails to allow to the administrators for the benefit of their attorneys the amount claimed by them, to-wit: $3,000.00; to so much of the judgment as allows to H. P. Cooper, or to H. S. McElroy, guardians *ad litem,* for expenditures in Florida and for services to be paid out of the estate; also to so much of the judgment as directs the master commissioner to expend annually any part of the fund in his hands for the support and maintenance of Sudie Shelby and Ann Shelby; and said defendants, Mrs. Buena McGoodwin, et al., pray an appeal to the Court of Appeals which is granted; and time is given and until and including to the third day of the next January term of this court to prepare and tender bill of exceptions; to so much of the foregoing judgment as allowed to the administrators the sum of $1,500.00 for services of their attorneys and as allowed to Wm. M. Yowell $300.00 for the services of his attorneys and as adjudges any of the cost accruing since April term, 1917, to be paid out of the estate and as overrules the exception filed June 30, 1917, to the administrators' report filed May 18, 1917, and pray an appeal to the Court of Appeals which is granted, and they are given to and including the. third day of the next term of this court to prepare and tender bill of exceptions herein.''

From this judgment, denying the Harrisons and Mrs. McGoodwin, right to participate in the estate under the compromise agreement and also from certain allowances to attorneys, they appealed. A cross-appeal is also prosecuted by the guardian on behalf of the Shelby children from the order allowing attorney fees.

Was the compromise agreement made between the guardian of the Shelby children and the Harrisons and Mrs. McGoodwin valid and binding? Ws it founded

upon sufficient consideration, or was there good reason, on the guardian's part, for entering into it? If it was valid and binding the chancellor erred in cancelling it. If, however, it was made without good reason and without sufficient consideration the court's order adjudging the compromise agreement invalid and awarding the whole of the estate to the children, should be upheld If the claim of the Shelby children was uncertain and doubtful; likely to be contested in long and expensive litigation by other claimants, and the wards' best interests were subserved by the compromise and settlement then the guardian acted within his powers as such, in making the compromise and it is binding both upon him and his wards.

To sustain appellants' contention that the compromise was made in good faith and for sufficient reason as well as consideration they review the facts in the possession of the guardian at the time he made the agreement.

Appellants charge that at that time the guardian knew that the administrators and presumptive heirs were prosecuting a search for other possible heirs of the estate; and further knew "that Thomas C. Shelby, a first cousin of Florrie Hood, had many years ago, become a fugitive from Kentucky, and had gone to an isolated portion of Calhoun county, an undeveloped portion of the state of Florida; that from that point, he had gone to Jackson county, Miss., taking with him, as mistress or concubine, W. M. Scott's daughter, Mary, who at that time went by the name of Stone, having one child by Murdick Stone whom she claimed to have been her husband, and another, a younger child, by another man, one Rhames, whose name she had not assumed; that in Mississippi she and Shelby lived, and passed in the community as husband and wife, having two bastard children born to them, all of whom, together with her child by Rhames, were called Shelby; that before the birth of her third child by Shelby, he and she had gone to Pensacola, Fla., and procured a marriage license in her name of Mrs. Mary E. Stone, but the license was not returned to the office nor any record made showing an actual marriage ceremony; that, meantime, about fifteen years before the death of Florrie Hood, W. M. Scott had removed from Calhoun county, to Chipley in Washington county, Florida, with his daughter, Samantha a younger sister of Mary; that Shelby, about the year 1908, died in Moss

Point, Miss., and Mary, who claimed to be his wife, went with her children to Chipley, where her father and sister lived; that, among the class of people with whom he associated, W. M. Scott, after coming to Chipley, had claimed to be a white man and such claim had not, so far as the guardian knew at the time, been publicly questioned, though his younger daughter, Samantha, after coming to Chipley, had married, or at least was living with and bearing the name of wife to one ——— Sapp, who was universally known and recognized and treated as a negro; that in 1909, shortly after coming to Chipley, Mary, who passed as Mrs. Shelby, married one Jim Lief, who was of mixed blood and who said he had come from Carolina, but he claimed to have learned from his mother that, with him, the mixture was of Indian and not of negro blood; that the children of Mrs. Lief were apparently white, and were, without question or investigation, permitted to attend the white public school in Chipley; that when the administrators of Florrie Hood, in their investigation of whether Thomas C. Shelby had left legitimate children who could be heirs of Florrie Hood, had traced these people to Chipley, Mrs. Lief had signed and sworn to an affidavit stating that she, under the name of Mrs. Mary E. Stone, was married to Thomas C. Shelby in Pensacola, Fla., and that she had, prior to that time, obtained in the circuit court of Calhoun county, at Blountstown, a divorce from her former husband, Murdick Stone, who was still alive, though she had not mentioned her life with Rhames, or the child begotten by him; that her affidavit as to the alleged divorce was found to be false, no proceeding for divorce having ever been instituted in Calhoun county, either by her or by Stone, and that if the alleged fact of marriage to Shelby, were true, such marriage was wilfully bigamous and void; that the only evidence of the alleged marriage to Shelby was the statement of Mrs. Lief herself, with no corroborative evidence, other than the fact that a license had been issued and not returned to the office; that it was then understood by all the parties that these bastard children of Tom Shelby could not inherit under the law of Florida or that of Kentucky; that very soon thereafter, however, the attorneys representing the administrators, and the presumptive heirs in the investigation, had notified the guardian that, under the peculiar construction placed upon the Kentucky Statutes (Florida

having no similar enactment), these children could inherit, notwithstanding their being illegitimate, provided there had been an actual marriage ceremony between Shelby and Mrs. Lief, and she were not a person of such mixed racial blood as to come within the category of 'negro or mulatto,' as used in the statute, a copy of which was sent to the guardian for his inspection; that the administrators, or their attorneys, had not investigated the race question further than that, Mrs. Leif and her father, though having indications of some mixed blood, passed as white persons where they were then living and where W. M. Scott had lived continuously for fifteen years, but had announced that they were satisfied with the chain of evidence as found and were ready to recognize the children as the legal heirs of Florrie Hood; that about this time and before any step could be taken toward a formal recognition of the claim of children, or any presentation of their claim in court, direct information was brought from Chipley by one of the attorneys representing W. M. Yowell, and one of those now asking a fee out of the estate for their efforts to find the Shelby children and protect their interests, that Mrs. Lief, their mother, had so much negro blood that the children could not inherit under the law of either state; that Mrs. Lief and her father, with anger and indignant bitterness, both denied that there was any ground for suspicion that either had any negro blood whatever, but the administrators decided that further investigation of this new information should be made, that the exact truth should be known, and that such further investigation was then made in Calhoun county, where E. M. Scott was born and raised, and where his daughter, Mary was born and lived until she went off with Shelby; that much information was obtained, and affidavits made by reputable citizens of good standing who had known the Scotts well, that W. M. Scott was a son of a half breed negro, Joe Scott, and that both he and his daughter Mary, so long as they lived in Calhoun county, associated with negroes, were recognized and treated as negroes, and that W. M. Scott has registered as a negro voter, and that so long as they lived in Calhoun county they never passed as white people; that when this information was obtained, W. M. Scott admitted that he had always borne the name of Scott, that his mother was the wife of Joe Scott, a negro, and that until he was grown he believed that he was the son of Joe Scott, the negro, but

that when he was grown his mother, long since dead, had told him that his father was a white man named Casselberry, and not her husband, Joe Scott, by whom she had several other children, all of whom are negroes, but only his half brothers and sisters; that W. M. Scott had given the names of several persons in Calhoun county who could prove the truth of his parentage, but an investigation by the guardian had resulted in finding that some of these persons were dead and the others would not testify as Scott claimed they would.''

While the Florida statutes contain no provision fixing the powers of guardians to compromise claims of their wards, the common law on the subject in force in that state is much the same as in Kentucky, according to the testimony of lawyers and judges of that state who appeared as expert witnesses. Our rule allows a statutory guardian to compromise and settle doubtful, contested claims of his ward where to do so will avoid litigation, or otherwise advance or protect the interest of the ward. In the case of Manion, By &c. v. Ohio Valley Railway Co., 99 Ky. 504, is it said: ''Without statutory restraint a guardian may compromise, settle and release claims and demands due to or made by or on behalf of his ward, and the ward will be bound thereby, unless it is done in bad faith or in fraud of his rights.'' The general rule as laid down by text-writers and courts generally is, that a guardian can do no act to the injury of his ward and if he attempts so to do, his acts are not binding upon the ward, especially if they are a disadvantage to him. The guardian may, without order of the court, sell personal property of the ward in his possession and reinvest the proceeds. While a guardian has no power to release valid or liquidated debts or claims due the ward, nor to compromise and receive property for his ward, yet he may compound and settle a doubtful claim or demand due his ward and the latter will be bound by such compromise unless the guardian is guilty of bad faith.

It is also laid down in Cyc. vol. 21, page 74, that a guardian has authority to submit to arbitration questions and controversies respecting the property and interest of his ward and the award will be valid and binding, whether ratified by the ward when *sui juris* or not. In the case of Worthington's Exors. v. Worthington's Devisees, 35 S. W. 1039 (Ky.), a controversy arose between certain heirs and devisees among whom were in-

fants represented by guardians; a large estate was involved and a will was being contested. As stated in the opinion, "an endless litigation confronted the executors and those entitled to the testator's bounty and no better mode of settlement could have been adopted to secure the estate to those entitled." A compromise agreement was entered into between the executors, heirs and devisees, some of whom were infants and represented by a guardian in the compromise. This court held "the guardian of the infants had full power to adjust these matters by settlement, and particularly when for the interest of all those laboring under disabilities," and affirmed the judgment of the lower court, upholding the compromise agreement.

In the case of Bunnell, &c. v. Bunnell, 111 Ky. 580, in discussing the power of a guardian to compromise doubtful claims of his ward, this court said: "So compromises are encouraged. But there must be in reality a controversy, and a basis for it, before it can form the consideration of such a settlement. Necessarily at last the right, and therefore the law, must be on one side or the other of the controversy, and it would not do to say that the doubtful case must be one concerning which no judicial interpretation has been applied. But it must be one about which well informed lawyers and judges may easily differ, and about which the parties themselves differ." The facts in this case bring it clearly within the rule stated in the Bunnell case, because the parties as well as their attorneys differed widely as to the rights of the several claimants, and there was ground for honest difference, and there remains much doubt as to who had the better claim. Confronted with such a situation it appears to us that the guardian acted wisely in entering into the compromise agreement whereby he certainly fixed the right of his wards to a one-third undivided interest in the net proceeds of the Hood estate. He, no doubt, was moved to do this by the fact that he and his wards were residents of the state of Florida, while his contenders were on the scene in Kentucky, fully acquainted with the surroundings, the courts, the juries, and all of the facts. They could better afford to enter into a long siege of litigation at home than could the guardian and the unknown and discredited heirs, residing many hundreds of miles away.

The trial court, after hearing the evidence introduced on the investigation of the compromise, was fully satisfied of the good faith of the parties entering into the compromise, for at the conclusion of the evidence the court, while evincing a keen desire to protect the interests of the wards stated: "But I am frank to say that since this has developed on the stand here and these letters have been read and all this testimony has been introduced, I see nothing wrong in the execution of this contract. I think these people acted in good faith in regard to the matter of investigation; I am satisfied on that proposition." The ground upon which the court set aside the agreement may be discerned in the following statement made by the court at the same time as the above: "If you can show me (the court) that there is no doubt as to whether or not these children are of mix-blood; if they are not of mix-blood, then there was no reason for the execution of this contract." Clearly it was a question in the mind of the trial judge as to the good faith of the parties making the compromise agreement, including the guardians, and whether or not there was sufficient reason or consideration upon which to rest a settlement. After the court announced its satisfaction with the good faith of the compromise he desired the guardians, *ad litem,* to satisfy him that the children of Thomas C. Shelby were not mulattoes. So that at this late hour in the proceedings, there was yet doubt in the mind of the learned trial judge even after a great volume of evidence had been heard and after he had the full advantage of the investigation made by the several attorneys and the administrators, as to whether the Shelby children were mulattoes, and therefore not entitled to inherit from the collateral kin of their putative father. If this be so, as must be conceded, then much more certainly was there great doubt and ground for honest differences of opinion, as to the right of the Shelby children to inherit the Hood estate at the time the guardian, Lockey, entered into a compromise agreement with the Harrisons and Mrs. McGoodwin, in November, 1915. Even now with all of this great volume of evidence before us, aided by the briefs of able and tireless counsel, there is doubt and uncertainty as to whether the parents of the Shelby children were ever married, and if married, was the wife a white woman. If either of these questions should be answered in the negative, and either may

be so determined if all the facts be known and considered, the right of the Shelby children to inherit the estate in question is forever tolled.

The Shelby children were not entitled to participate in the estate of Florrie Hood if (1) they were bastards, or were born out of wedlock and their parents were not thereafter married; or (2) if they are mulattoes. The statutes, section 166 says:

"Every child shall be deemed a bastard who shall be begotten and born out of lawful wedlock."

Section 2098 says:

"The issue of an illegal or void marriage shall be legitimate, except, . . . the issue . . . of a marriage between a white person and a negro or mulatto, shall not be legitimate."

Upon the cross-appeal we are of opinion that the allowance of fifteen hundred dollars made by the lower court to the attorneys for the administrators was larger than it should have been; considering the same attorneys were representing other clients in the same matter, we think one thousand dollars will be a sufficient allowance under all the circumstances. No allowance should have been made to counsel for Yowell, because the real purpose of his suit and connection with the case was the recovery of his claim, originally about twenty-four thousand dollars. In the recent case of Girty v. Girty's Admr., et al. 180 Ky. 786, it was held that where a creditor of an estate, who had recovered judgment against the administrator, brought suit to settle the estate, but the real purpose of the suit was to collect his judgment, and the services rendered by his attorneys were alone for his benefit and not for the benefit of the estate as such, his attorneys were not entitled to a fee payable out of the estate.

The allowance to the guardians ad litem should have been one fee only and should not have exceeded two hundred dollars. The expenses allowed the guardians ad litem, going to Florida to investigate the facts, was proper.

In recapitulation, we may say that the appellants' contention (1) that the Shelby children are not the issue of marriage and that their parents were not married after the birth of the children; and (2) if the parents were in fact married, the marriage was void, because between a white man and negro or mulatto woman is even now

a vexing question. In any event appellants' assertion (1) that there could not have been a lawful marriage between Shelby and the widow Stone, the mother of the Shelby children, because she had at the time a living husband from whom she was not divorced; and (2) she was a mulatto, are unsettled questions. If these charges are true, or there are facts tending to establish the truth thereof, then there was good reason why the guardian should have entered into the compromise agreement annulled by the trial court.

We, therefore, conclude that the trial court erred in holding that the compromise agreement was unauthorized, without consideration, null and void. It was also in error in making the allowance to attorneys as above indicated.

For these reasons the judgment is reversed with directions to enter an order adjudging the compromise agreement valid and binding, fixing the attorneys' fees as above set forth, and for further proceedings not inconsistent with this opinion.