## McGoodwin, et al. v. Shelby, et al.

(Decided December 6, 1918.)

### Appeal from Marion Circuit Court.

1. Guardian and Ward—Foreign Guardian.—A foreign guardian has no more control over the land of his ward in this state than a guardian appointed in this state, and before he can compound a debt or demand, or settle or compromise any controversy concerning the lands of his ward, he must obtain the approval of the court.

2. Marriage—Presumptions—Legitimacy of Offspring.—Where it appears that a marriage license was issued authorizing the marriage of a man and woman who subsequently lived together for years as husband and wife, and were so recognized by the public, it will be presumed that they were married and that their offspring is legitimate.

3. Statutes—Laws in Force in Virginia.—Under section 233 of the Kentucky Constitution all laws in force in Virginia on June 1, 1792, and which are of a general nature and not local to that state, and not repugnant to the Kentucky Constitution, nor to the laws which have been enacted by the general assembly of this Commonwealth, are in force within this state unless they have been altered or repealed by the general assembly.

4. Statutes—Virginia Act of 1785—Mulattoes.—The Virginia act of 1785 declaring that a person having one-fourth part or more of negro blood shall be deemed a mulatto, is in force in Kentucky by virtue of section 233 of the Constitution.

5. Appeal and Error—Finding of Chancellor.—Where the proof is contradictory and the mind is left in doubt upon a question of fact, the finding of the chancellor will not be disturbed.

H. W. RIVES and CHARLES H. RODES for appellants.

EDWARD C. O'REAR, J. C. JONES, HOBSON & HOBSON, H. P. COOPER and H. S. McELROY for appellees.

RESPONSE OF THE COURT BY JUDGE MILLER TO THE PETITION FOR A REHEARING—Granting rehearing, and affirming in part and reversing in part upon the original appeal, and the cross-appeal.

The original opinion in this case reversed the judgment of the circuit court which had refused to confirm the settlement made by the guardian of the infant appellees, William Hood Shelby, Sudie Shelby and Anne Shelby. See 181 Ky. 230. The facts shown by the record are there set out in detail.

The estate of these infants consisted of land in Kentucky worth about $20,000.00, which they had inherited from Miss Florrie Hood, a first cousin of their mother. The subsequent sale of the land did not change the character of the estate inherited, or the powers and duties of the guardian concerning it. The infants resided in Florida, and Lockey was their guardian appointed in that state. Without leave of court Lockey undertook to make a compromise by which he surrendered two-thirds of his wards' inheritance to the appellants in consideration that they would not contest the infants' rights to the other third. The circuit court refused to approve this compromise and a reversal of the action of the court in that respect was the chief purpose of the appeal.

It is now insisted that while the former opinion properly announced the general common law rule applicable to the compromise of disputed claims between adults, it failed to apply the statute requiring the approval of the court of a guardian's compromise of any controversy concerning the lands of his ward. Ky. Sts., sec. 2030. Preliminary, however, to the reconsideration of that question, we will dispose of a minor question that has been pressed upon our attention.

It is suggested that as Lockey is a Florida guardian, he is not bound by the Kentucky statute applicable to guardians appointed in Kentucky. But, before a foreign guardian can exercise any authority over the ward's estate in Kentucky he must be authorized to do so by the county court of this state having jurisdiction to appoint a guardian. Ky. Sts., sec. 2041. And before this authority is conferred certain facts must be shown to the satisfaction of the court. Ky. Sts., sec. 2042. Section 2041, *supra*, provides that the county court having jurisdiction to appoint a guardian may authorize the foreign guardian to sue for, recover and remove any personal estate of such minor, "or otherwise to act as a guardian appointed in this Commonwealth." The order of the Marion county court authorized Lockey, the Florida guardian, to sue for and recover any and all personalty that may be due or coming to his wards in this state, and prohibited him from removing same out of the state until he shall have executed further bond as guardian after ascertaining the amount that might be recovered for his wards.

The order did not authorize Lockey "to act as a guardian appointed in this Commonwealth;" it only authorized him to sue, recover and hold the estate due and coming to his wards. This order was not copied into the transcript, but it was assumed by all parties concerned that it did confer the broad power upon Lockey to act as a guardian appointed in this Commonwealth. The infant defendants now move the court to file a supplemental and complete record containing this order and other proceedings of the lower court; and, as this motion is made on behalf of infants, it will be sustained and the supplemental record filed. Wade v. Wade, 154 Ky. 24; Miller Creek R. Co.' v. Barnett, 160 Ky. 845; C. & O. R. Co. v. Kelly, 161 Ky. 664.

The contract of the Florida guardian, so far as the land was concerned, was of no effect. Williams v. Duncan, 92 Ky. 125; Watts v. Wilson, 103 Ky. 495. The right of the guardian, therefore, to make the compromise, and its effect, depended upon the law of Kentucky; and, if Lockey had been authorized by the county court of this state to act as a guardian appointed in this Commonwealth, he would have had no more authority to make the compromise than a Kentucky guardian would have had.

Section 2030 of the Kentucky Statutes, relating to the powers and duties of a guardian, reads in part as follows:

"He shall also receive and sue for the debts and demands owing to the ward, defend actions against him, and, with leave of the court, may compound a debt or demand, or settle or compromise any controversy concerning the lands of his ward when the interests of the ward will be subserved thereby."

It has been repeatedly held, under this statute, that the compromise of a controversy concerning lands can be made only with leave of the court. Bunnell v. Bunnell, 111 Ky. 566; Skidmore v. Cumberland Valley Land Co., 126 Ky. 576. And, before the court will give its consent to the compromise, it must be satisfied that the interests of the ward will be subserved thereby. In 12 R. C. L., p. 1230, it is said:

"A statutory provision that the guardian shall, with the approbation of the court, compound for the same and give a discharge to the debtor is mandatory, limits the common law powers of the guardian, and makes a com-

promise not approved by the court subject to avoidance by the ward."

It will be observed that the Kentucky statute, *supra,* is specific and unequivocal and leaves a guardian who compromises a controversy concerning lands of his ward without leave of the court, without the protection of the law. Elliott v. Fowler, 112 Ky. 376.

So, the circuit court properly had before it the question whether it would, under the proof, approve this settlement whereby the guardian released two-thirds of the landed estate of his wards; and if, in the exercise of a sound discretion, the circuit court refused to give that necessary approval, the judgment should be affirmed.

We are, however, asked to reverse that action upon the ground that the compromise was a wise one and that the circuit court should have approved it. It would, perhaps, be more in accord with the principles of the statute to say that a reversal is asked upon the ground that the judgment of the circuit court is against the weight of the evidence, and that the circuit court abused its discretion. This contention requires a short review of the proof upon which the circuit court refused its approval.

.The chief ground relied upon as a justification of the compromise was that the questioned legitimacy of these infant appellees was sufficient to imperil their title to inherit as the heirs of Florrie Hood. It was contended that their parents were never married; and their legitimacy was further attacked under section 2098 of the Kentucky Statutes providing that "the issue . . . of a marriage between a white person and a negro or mulatto, shall not be legitimate." It is further provided, however, by section 1398 of the Kentucky Statutes that if a man having had a child by a woman shall afterwards marry her, such child or its descendants, if recognized by him before or after marriage, shall be deemed legitimate.

The parol proof in this case shows that Thomas Shelby and Mary E. Scott, the parents of appellees, were married; that they lived together for years as husband and wife and were so recognized by the public; and that a marriage license was issued to them although there is no record found showing it was ever returned. Legitimacy being presumed, it cannot be said that there is any reasonable doubt as to the legitimacy of these in-

fant defendants by reason of the want of a marriage relation between their parents. Rockcastle M. L. & O. Co. v. Baker, 167 Ky. 66.

But it is contended that the appellees are illegitimate and incapable of inheriting because they are the issue of a marriage between a white person and a mulatto. Upon this issue there is some evidence tending to show that the appellees' great-grandfather, Joe Scott, was a negro; that William Scott, their grandfather, was the issue of a marriage between Joe Scott and a white woman; and it clearly appears that Mary E. Scott, their mother, was the issue of the marriage of William Scott with a white woman, and that their father, Thomas E. Shelby, was a white man. It further appears, however, that William Scott, the grandfather, was a preacher to a white congregation, and there is strong evidence that he was the son of Casselberry, a white man. Taking the proof upon this point in its strongest aspect against these infants, and assuming that Joe Scott was a negro of pure blood, it would make William Scott a half-breed, Mary E. Scott, their mother, of one-fourth negro blood. But it will be seen that the proof against this conclusion is the stronger.

Turning then to the proof touching the question of Mary Scott's alleged negro blood, we find that William Strange, who was the most favorable witness for the appellants on this point, testified that Joe Scott, the great-grandfather, was a "mixed negro and white blood," but he did not know the proportion; that Joe Scott was neither white nor black but was what he would call a mulatto, his hair being a light dark color and curly or wavy, and that, as far as he knows, he was a free man.

M. C. Rhames testified that he had known William Scott (or Casselberry) all his life; that he was known in the settlement where he lived as a white man; that he mixed and mingled with the white people at the dances and gatherings and danced with them, and that he preached in the churches of the white people; that his wife was a white woman, and that the witness attended the white schools with Mary Scott, the mother of these infants.

Ada Rhames testified that she was acquainted with William Scott or Casselberry, as he is called, and that his mother, as far as the witness knew, was a pure blooded

white woman; and that she knew Mary Scott, his daughter, and that Mary attended the white schools.

L. W. Williams testified that his sister, who was the mother of appellees' mother, was the wife of William Scott or Casselberry, and that she was a white woman; that William Scott was always considered a white man, and that he and his family attended the white schools and churches—William Scott being a member and a preacher in the white churches.

Susan Adkins, aged 84, testified that she had lived in the neighborhood of Scott's Landing 40 or 50 years; that she had known William Casselberry, sometimes called William Scott, since his childhood; that he was the son of Elias Casselberry and Susan Anne Brouse, his wife, both white; that after Elias Casselberry's death his widow took up with Joe Scott, by whom she had several children; and that while Joe Scott was of mixed blood, he was not a negro but was mixed up with some other kind of nation, perhaps of Indian mixture.

Under this proof, therefore, it cannot be said that Joe Scott had more than one-half negro blood; or that William Scott could have had more than one-fourth negro blood, if he was the son of Joe Scott, and no negro blood at all if he was the son of Casselberry; and that Mary Scott, the mother of these infant defendants, could at most have had no more than one-eighth negro blood, and probably had none at all.

Taking the proof in its strongest aspect against these infants by assuming that Joe Scott was a half-breed and the father of William Scott, the question then arises are these children the issue between a white person and a mulatto? Their father was white; was their mother a mulatto?

In Ferrell v. Ferrell, 153 N. C. 174, it was held that in order to render a marriage void under a statute forbidding marriages between a white person and a person of negro descent to the third generation inclusive, the negro ancestry of the third generation must be pure negro blood, and not merely one who had his status as a negro ascertained and fixed by recognition and general consensus of the community where his lot was cast. The most that appellant's proof shows in this respect relates to the social station of the grandfather, William Scott, and the great-grandfather, Joe Scott.

This court has never passed upon the question as to what constitutes a mulatto, unless it can be said to have done so indirectly in Gentry v. Polly McGinnis, 3 Dana 386, where Chief Justice Robertson said:

"Therefore, being a mulatto, or having at least one-fourth of African blood, has been held, in Virginia and Kentucky, to be presumptive evidence of being a slave. And, *e converso,* it has been as well settled, that being a white person, or having less than a fourth of African blood, is *prima facie* evidence of freedom. The rule is that a person, visibly a negro, is *prima facie* a slave; but that apparently a white person or an Indian, is *prima facie* free."

The term mulatto is derived from the Latin word *mulus,* a mule, and is defined by Webster as follows:

"The offspring of a negress by a white man, or of a white woman by a negro—usually of a brownish yellow complexion." Inter. Dict.

But, if any doubt should exist, as to what constitutes a mulatto, or whether Mary Scott was a mulatto, it must be treated as settled against that contention by the act of the Virginia legislature of 1785, which reads as follows:

"Be it enacted by the General Assembly, that every person of whose grandfathers or grandmothers any one is, or shall have been a negro, although all his other progenitors, except that descending from the negro, shall have been white persons, shall be deemed a mulatto; and so every person who shall have one-fourth part or more of negro blood, shall, in like manner be deemed a mulatto." 12 Hening's St. Law, p. 784; M. & B. St. Law Ky., vol. 2, p. 1219.

This Virginia statute was incorporated into our jurisprudence by section 233 of the Constitution of Kentucky reading as follows:

"All laws which, on the 1st day of June, one thousand seven hundred and ninety-two, were in force in the State of Virginia, and which are of a general nature and not local to that state, and not repugnant to this Constitution, nor to the laws which have been enacted by the General Assembly of this Commonwealth, shall be in force within this state until they shall be altered or repealed by the General Assembly."

This provision has been incorporated into the several constitutions of Kentucky; and, no doubt for that reason, and the existence of the Virginia statute, the general

assembly has not deemed it necessary to legislate upon the subject. Const. 1792, art. 8, sec. 6; Const. 1799, art. 6, sec. 8; Const. 1850, art. 8, sec. 8.

The Virginia act of 1785 being of a general nature, and not local to that state, and not repugnant to the Kentucky Constitution, nor to the laws of this Commonwealth, is in force within this state by virtue of section 233 of the Constitution above quoted. Lathrop v. Bank of Scioto, 8 Dana 114; Ray v. Sweeney, 14 Bush 1; Campbell v. W. M. Ritter Lumber Co., 140 Ky. 312; Nider v. Commonwealth, 140 Ky. 687.

Construing the proof in its strongest light against appellees and consequently treating Joe Scott as a half-breed and the father of William Scott, the latter was of one-fourth negro blood, and probably white; and Mary the mother of appellees was of no more than one-eighth negro blood, and probably white.

Under the weight of the testimony and the rule fixed by the Virginia statute above quoted, Mary Scott was not a mulatto, and these appellees were not illegitimate under the Kentucky statute; and under the thoroughly established rule that where the proof is contradictory and the mind is left in doubt upon a question of fact, the finding of the chancellor will not be disturbed. Byassee v. Evans, 143 Ky. 415; Kirkpatrick, Exr. v. Rehkopf, 144 Ky. 134; Dotson v. Norman, 159 Ky. 786; Manchester Natl. Bank v. Herndon, 181 Ky. 117; Meade v. Steel Coal Co., 181 Ky. 157; Cummings v. Watson, 182 Ky. 56.

A rehearing is granted; so much of the former opinion as fixes and denies attorneys' fees and expenses is adhered to and the judgment is, to that extent, reversed; in other respects the judgment of the circuit court is affirmed upon the appeal and upon the cross-appeal. The whole court sitting.